*The following opinions were delivered:
By the Chancellor.
I can see nothing in the charge of the judge, at the circuit, which was calculated to mislead the jury. He certainly was right in saying that it was not material whether the recommendation through Wilson constituted, the only recommendation; that it was sufficient if the plaintiff was moved by that recommendation in giving the credit. It appears in this case that the letter of Hickcox, the merchant at Buffalo, was written in good faith, although it does not distinctly appear what the precise contents of that letter were; and there is no doubt that letter, as well as the false and fraudulent representation of Baker that he had beef coming to Wilson, had more or less influence on the mind of the person giving the credit; yet if the recommendation through Wilson was necessary to be superadded to enable Baker to obtain the credit, the defendant is as much liable for the damage sustained, as if that had been the only inducement to the credit. If the mind of the vendor as to giving the credit was nearly balanced, and the jury were satisfied that this fraudulent act of the defendant turned the scale, and induced him to part with the goods, he who was guilty of the fraud was properly holden to be answerable for the consequences thereof. Even where two persons, without preconcert, are guilty of fraudulent misrepresentations as to the credit of a purchaser, if the representations of both were necessary to induce the vendor to part with his goods, either might be made liable for the whole loss, as there is no contribution as between wrong doers. The fact that the clerk went to Wilson to obtain information as to the credit of Baker, although he had before seen the letter of Hickcox, and after inquiries had been made of one of the members of the firm to whom that letter was addressed, was of itself sufficient to authorize the jury to conclude he was not satisfied with the recommendation, whatever it might have been, which was contained in that letter; and in the language of the judge, that the mind of the vendor was moved in giving the credit, by the recommendation of the plaintiff through Wilson.
*What was said as to the right of the plaintiff to pursue the property, after the delivery thereof to Baker, on board the vessel, while on its transition from New York, could not have meant a technical right of stoppage in transitu, which can only be exercised before the delivery of the goods to the purchaser. But as the goods in this case were obtained by actual fraud, the vendor had an unquestionable right to pursue and reclaim them, not only on their transition from New-York, but at any time afterwards, until they got into *383 the hands of a bona fide purchaser without notice of the fraud. In this case, as the defendant had notice of the fraud when he purchased the goods at the sheriff’s sale, the plaintiff might have followed them, or the proceeds thereof into his hands. And if there had been a count in trover in this declaration, there could have been no difficulty in recovering under that count for the value of that portion of the goods which actually came to the hands of the defendant and was converted to his own use. See The Earl of Bristol v. Wilsmore, 2 Dow. & Ry. R. 760. Tamplin v. Addy, 8 Cowen, 239, note.
The facts in this case as detailed in the bill of exceptions, were unquestionably sufficient, if the declaration is properly framed for this purpose, to entitle the plaintiff to recover against the defendant, as a party to the fraud. The law, I consider, as settled in this state, that a fraudulent misrepresentation or an intentional deception of the vendor, by a third person, for the purpose of enabling the purchaser to defraud such vendor of his property, forms a good ground of action against the party who is guilty of making such misrepresentation, or practicing such deceit. It is a principle of natural law, which is constantly acted upon in courts of justice, to hold the accessaries, as well as the principal party, answerable to make restitution for the damages sustained by an unlawful or fraudulent act; and those are considered accessaries who, knowingly and intentionally, assist the principal party in doing the unlawful act, or in perpetrating the fraud. In this case the defendant was not satisfied with advising his nephew to do an act which, if prosecuted in due time, would probably have sent him to the state prison for obtaining goods by false pretences ; but he actually undertook to aid him in *this fraudulent and illegal act. The letter written by the defendant, although artfully drawn was undoubtedly intended to convey an impression to the mind of Wilson that Baker was a merchant of fair standing and worthy of credit, who was going to New-York to buy goods in the ordinary way of business. By this means he intended to induce Wilson to hold him out as such, to those who were intended to be defrauded of their goods, when the writer in fact knew that he was in failing circumstances, and that he intended to obtain the goods of the New-York merchants for the fraudulent purpose of subjecting them to executions which might be issued on the defendant’s judgments; and also to enable himself to compromise with his creditors, generally, by paying them a certain portion of their debts. The jury have found that this deceptive and fraudulent letter did accomplish the object for which it was intended by the defendant; and both reason and natural justice require that he should be held liable for the damage the plaintiff has sustained by that fraud.
It is not necessary that the defendant should have had any particular individual in view as the person who was to be defrauded. Although, if it had appeared that he wrote the letter with the intention of defrauding one person, and Baker had, without his consent, used it to defraud another, it is doubtful whether he could be made liable as an accessory to that fraud ; but when it appears he intended it should be used for the purpose of deceiving the persons from whom Baker might think proper to purchase goods, the defendant is answerable for the use which was made of the letter, although he might never have heard of the plaintiff until after the fraud was perpetrated. The observation of Lord Kenyon, in Scott v. Lara, 1 Peake’s N. P. R. 226, was proper, perhaps, when applied to that case. The declaration there alleged that the false allegation, as to credit, was made to Lindo, with intent to defraud the plaintiffs and to induce them to trust Valentine. But it appeared that Lindo made the inquiry as to the credit of Valentine, without informing the defendant that any person other than himself had any interest in the question, or that Valentine *385 was about to deal with the plaintiff or any one else. Neither did Lindo communicate to the #plaintiffs the information obtained. His Lordship said the two circumstances must concur to sustain the action; for it must appear that the lie was told for the purpose of imposing on the plaintiffs, and that they, relying on that information, were deceived. For aught that appeared in that case, the defendant might have supposed the question was asked from mere idle curiosity; or his object might have been to defraud Lindo only, without knowing that any other person was likely to be injured by the false affirmation. But where a party plans a deliberate fraud, and furnishes the means to another person to carry that plan into effect upon some one of a particular class of persons, as in this case, it is idle to contend that he is not answerable for the consequences, because he did not know upon what particular individuals of the class the fraud would be perpetrated.
The only remaining questions, therefore, are whether the declaration" in this case is properly framed to meet the proof given on the trial; and whether it is sufficient in substance, after verdict, to sustain an action. The first count is upon a false and deceitful affirmation by the defendant to the plaintiff, that Baker was a person worthy of credit, and safely to be trusted. This count, in itself, contains a good cause of action, but I think the proof on the trial did not support it, and that if there had been no other count in the declaration, it would have been the duty of the judge to have granted the motion for a nonsuit. If, therefore, both the other counts of the declaration are so defective in substance as not to be cured by the verdict, it is not a case in which the court could have authorized the verdict to be amended, by entering it upon the first count only. The proof, however, was sufficient to establish every thing which the plaintiff had alleged in the second and third counts of his declaration. And as the question as to the goodness of those counts does not arise upon the motion for a new trial upon the bill of exceptions, the decision of the supreme court in denying that motion with costs, was correct, and should be affirmed.
But there was also a motion in arrest of judgment, and in considering that motion, we must lay out of view every thing that took place at the trial, and examine the declaration, in *connection with the general verdict of the jury, in the same manner as if this bill of exceptions was not contained in the record; and, as general damages have been assessed, if either of the counts of the declaration is so defective, that no proof, which we can properly presume from the verdict, to have been given under the same, would constitute a good cause of action, the decision of the supreme court in refusing to arrest the judgment, must be reversed; but if the evidence given at the trial was equally applicable to counts which are good, as to those which are defective in substance, we may send the cause back to the supreme court, with liberty to the plaintiff to apply for an amendment of the postea, by the judge’s notes, or by the evidence as stated at length in the bill of exceptions ; and to enter the verdict and judgment in his favor upon the good counts only.
In deciding whether there was such a defect in substance in the declaration as rendered a judgment thereon in favor of the plaintiff erroneous, it was at the common law, material to inquire whether the question arose upon demurrer, or after judgment by default, or whether it arose after verdict. Many defects which in the first case would have rendered the declaration bad, in substance, would be cured by a verdict. Defects of this kind are now embraced by the seventh section of the title of the revised statutes relative to the amendment of pleadings and proceedings in civil cases. (2 R. S. 424.) The ninth subdivision of that section provides, that the judgment upon a verdict shall not be stayed, nor shall the same be reversed, for the omission of any allegation or *387 averment of any matter without proving which, the jury ought not to have given such verdict. This embraces the same class of defects which were cured by a verdict at the common law : the principle of which was equally broad in this respect. As the jury ought not to give a verdict for the plaintiff unless, upon the trial, he succeeds in proving every material fact and circumstance alleged in the declaration, or which might be fairly implied from what is there alleged, the court, after verdict, will intend or presume that such facts and circumstances, omitted or defectively stated in the pleadings, were proved on the trial. *But it is the duty of the jury to give a verdict for the plaintiff, if he proves every thing alleged in, or which may be implied from' the declaration; and therefore, if the plaintiff totally omits to state a good title or cause of action, even by implication, matters which are neither stated or implied, need not be proved at the trial, and there is no room for intendment or presumption; as the intendment must arise from the verdict when considered in connection with the issue upon which that verdict was given. See 2 Tidd’s Pr., 9 Lond. ed. 919. Jackson v. Pesked, 1 Maule & Sel. 234. There is no doubt, in the present case, that the second and third counts of the declaration would have been bad on general demurrer: because the plaintiff has wholly omitted to state, except by inference, in what manner Wilson was induced by the defendant to assist Baker to obtain the goods on credit; and it only appears by implication, that the assistance which Wilson was induced to render, and did render, was by recommending him as worthy of credit. It does, however, sufficiently appear by inference that the assistance which Wilson rendered to Baker in procuring the goods on credit, at the instance of the defendant, was by representing him as a person worthy of trust and credit; and if this was the only defect in the declaration, I think it would have been cured by the verdict, upon the principles which I have before stated. But there is one material averment contained in the first and third counts which, from carelessness or otherwise, is wholly omitted in the second count. All the cases of this kind, against third persons, who are not personally interested in the transaction to which the false affirmation or improper concealment relates, go upon the ground that the defendant has practiced an intentional deception upon the plaintiff for the purpose of doing him an injury. It is necessary, therefore, that the plaintiff should aver that the false representation was made, or the truth suppressed, with an intention to deceive and defraud ; and that allegation must also be proved, to the satisfaction of the jury, on the trial. The fact that the defendant knew that the plaintiff was about to part with his goods on the faith of his representation, might, I admit, be presumptive evidence of an intention to deceive and defraud ■; but it would be a mere presumption of fact, *which might be rebutted by other facts and circumstances, if the intention to deceive was averred in the declaration so as to constitute a material part of the issue to be tried between the parties. I think the second count is defective in substance, for the want of such an averment; and that this defect is not cured by the verdict.
Although both of these counts were objected to as defective, upon the motion in arrest of judgment, yet it is evident, from the report of the case in the court below, that the defects were not pointed out with much particularity by the counsel. The attention of the court was principally directed to the question as to the plaintiff’s right to recover, upon the facts actually proved at the trial. It is therefore not surprising that these defects, particularly the one in the second count to which I have alluded, should have been overlooked by the chief justice, who delivered the opinion of the supreme court. I did not myself discover the want of that necessary averment in the second count until after the .close *389 of the argument of the cause in this court. I regret that it is not in my power to sustain the recovery in this case, as it appears from the bill of exceptions that a most gross fraud has been practiced upon the plaintiff, and that the defendant has pocketed the proceeds of that fraud ; but if the other members of this court should agree with me in supposing the defect in the second count is not cured by the verdict, the decision of the supreme court in denying the motion in arrest of judgment must be reversed, on this ground. But if the majority of the court consider the evidence sufficient in substance to sustain the action, and that the defects in the second count are cured by the verdict, I think we should send the cause back to the supreme court, with liberty to the plaintiff to amend his postea, and to have a proper judgment entered on the good counts.
By Senator Beardsley. It was contended, on the argument of this cause, that an action could not be sustained for fraudulently representing a man worthy of credit, whereby he obtained credit, and thus was enabled to cheat the person upon whose credulity he had practiced; in other words, that the principle established in Palsey v. Freeman, 3 T. R. 51, which had repeatedly been recognized by the supreme court of this state, and other American courts, had never been adopted by this court.
The very able opinion of the supreme court on this part of the case renders it unnecessary to discuss this question to any considerable extent, or to review the authorities. I fully concur in the correctness of the principle, that a person making a false representation as to the credit of a third, person, knowingly and with an intention to defraud, is equally liable where damages ensue, as he who makes a fraudulent representation in regard to the soundness or qualities of personal property. The latter proposition, I believe, has never been doubted, and it appears to me that the same principal will as well sustain the one as the other ; and in regard to personal property, the books are full of authorities that the fraudulent suppression of facts, where damages ensue, is equally actionable as a false and fraudulent representation. Our statute against obtaining goods by false pretenses, and rendering a party liable to indictment and severe punishment as a criminal, proceeds on a recognition of this principle ; and surely, if a party may be criminally punished for fraud, it is not carrying the principle to an unreasonable extent to hold him responsible in damages, where he has knowingly and intentionally defrauded, or aided another to commit a fraud.
I fully concur in the sentiment of the circuit judge, which was recognized by the supreme court, that, to maintain the, action, it was not necessary that the fraud complained of was the only inducement to the credit. If such fraudulent representation or fraudulent suppression of facts in the language of the circuit judge moved the party to give credit and to part with his goods, it was sufficient the defendant liable. Nor does it lie with a party who has been guilty of fraudulent representations, whereby a credit has been improvidently given, to say that the party practiced upon did not exercise due diligence—that he too readily yielded to the suggestions and became the dupe of those who intended to deceive him. If he has been over credulous, it is no justification to the party who has practiced a fraud, that a more wary adversary would have avoided it. Nor does it, in my opinion, change *the character of the transaction in this case, or the right of the plaintiff below to recover, whether the fact be that Addington’s letter first induced an assent on the part of Allen to sell, or subsequently to part with the possession by a delivery of the goods, or eventually prevented his pursuit to reclaim the possession which he had a right to do if he had been deceived and defrauded, and thus to disaffirm the contract.
*390 I will not further pursue this part of the case, but will proceed to inquire whether a fraud has been committed by the defendant. And here I might repose myself on the finding of the jury, which, upon authorities uniform and abundant, sustains the proposition that where the question is fraud or no fraud, it is peculiarly the province of the jury to settle the facts ; and no court should interfere with such finding, unless the verdict is so strongly against evidence as to raise the presumption of prejudice or gross misapprehension on the part of the jury, and thus afford an excuse for a new trial. But I will not stop and say that the verdict is conclusive, but notice some of the leading facts proved on the trial, which are perfectly satisfactory to my mind that no intelligent jury could, on the evidence offered, give a verdict acquitting Addington of fraud. In arriving at the conclusion that Addington was guilty, the jury undoubtedly took into consideration that George W. Baker, the acquaintance, as Addington called him in his letter, was a nepheio ; that he had been established in business by Addington for several years ; that. Addington, from time to time, had taken judgments against him, which he kept in force for the full amount, notwithstanding the sale of 327 barrels of beef and 3700 pounds of tallow, worth $1931, according to Baker’s testimony ; that Baker was indebted for cattle to the amount of $1000 when he disposed of the beef; that he was indebted to a considerable extent in Buffalo, and was owing $3500 or $4000 in Albany; that this acquaintance called on his uncle Addington, on his way to New-York, stayed with him not more than an hour, as he represents—in the course of an hour, in answer to an inquiry of Addington, told him he was 11 getting along tolerably well,” but said nothing, according to his own testimony, that should induce Addington to believe his affairs less prosperous than they had been, *and no conversation was had relative to his obtaining goods in New-York with a view of subjecting them to Addington’s claim, or of satisfying his debt—this is Baker’s statement; and yet it appeared, from the testimony of Theophilus Steel, that shortly after Baker left Paris for New-York, Addington said “ Baker must fail,” and that he had advised him “to go to New-York and get what goods he could; that his affairs were so deranged that he could not get along.” Addington justified this as a “judicious and moral” course, and said Baker owed him a considerable sum, and he would be able to get his pay, and Baker he thought would have enough to compromise with his creditors. This testimony was fully corroborated by Mrs. Steel and Pamela Hall, who heard Addington say that Baker was gone to New-York after goods ; that he was to get trusted for all he could ; that he could not get along in business—he must fail; that he, Addington, had advised him to go to New-York and run in debt all he could, for he might as well fail for something as nothing. These facts, showing the original intention of Baker and Addington to cheat and defraud somebody the jury had before them, and undoubtedly believed the whole the result of a preconcerted plot, and the facts well warranted that conclusion. But they had more than this, because abundant proof was furnished, showing the subsequent conduct of the uncle and acquaintance to be precisely such as might be expected to result from such a corrupt combination. Baker and Addington met in Albany, as Baker swore he expected they would, and no doubt the jury believed this was by preconcert, as it was found necessary for Addington to make advances to enable his acquaintance to get his goods through the city, and to get off himself. It was then too early for Addington to resort to his executions, as it would have been too apparent on the face of the transaction that the whole was a fraudulent device. It was therefore necessary to have the goods sent on to Baker’s stores in Aurora and Wales, where Addington shortly appeared *392 with his executions, having let them rest, as he told Havens, as long as he could, as Baker was insolvent. In addition to this, Addington wished the sheriff to sell the goods in large lots, undoubtedly that they might be purchased by him *and his brother at better advantage than in small parcels. Baker was then put or left in possession, to sell out the goods for his uncle, and Addington immediately set about to effect a compromise for his acquaintance, as he had intimated to Steel might probably be done, in his conversation a few months before.
Here most surely was evidence enough to justify the jury in believing that the whole was the result of a premeditated design on the part of Addington and Baker. They could not rationally have come to a different conclusion, and this too without relying upon the suspicious, circumstances testified to. by other witnesses. In this conclusion, I grant that they disregarded the principal part of Baker’s testimony, and it was right that they should do so. He was contradicted by Wilson and Havens ; he had imposed upon Hickcox in obtaining a letter of credit without disclosing his insolvency ; he had equivocated to Havens in answer to a question as to how much he owed in Albany, by telling him that he owed Starr $1500, when he in fact owed him $2200 and was owing other debts in Albany, amounting, in the whole, to $3500 or $4000. In addition to all this, he had contracted debts in New-York to about $4000, when he knew he was utterly unable to pay for the goods he obtained. Now, without necessarily relying upon the palpable contradictions between him and other witnesses, I confess that were I sitting as a juror, I should fell a strong repugnance to believe such a man, even if uncontradicted; and most certainly I should not, where he had purposes to subserve by misrepresentation. The jury were right in disregarding his testimony ; his conduct had been such, and his testimony such, as not to entitle him to belief. Viewing the whole then, as I suppose the jury did, as a premeditated device between the uncle and nephew to defraud, let us for a moment look at the letter to Wilson. Those who believed that Addington and Baker intended to cheat, would not expect a letter recommending Baker as being worthy of credit. Such a letter would defeat its object, as it would at once render Addington liable, on showing that he knew that Baker was insolvent; and Addington was lawyer enough to know it would not answer to write such a letter. Nor would it do to state that he had three heavy judgments *against Baker, ready to be put in force against any property he might purchase. Such a disclosure would have destroyed Baker’s credit, and defeated the object at once. The jury believed that Addington’s object in writing was to give Baker credit, and they had no right to expect a letter that would have a contrary tendency. It was perfectly in character with the plot, to write a letter that should have a tendency to induce credit, and not render the writer liable. It must be ambiguous ; a nephew, who had been started and continued in business for years, must coldly and cautiously be turned into an acquaintance. “ The bearer, Mr. Baker, is the man who I informed you, when at Utica, I had agreed with for beef, and would drive to the Palmyra establishment; he has had 327 barrels packed there, marked with my name, and forwarded to your yard the beef I have purchased.” And again : “ Mr. Baker is going to your place to purchase goods ; he has been a merchant some time at Aurora, Erie county—he has bought his goods at Buffalo, Utica and elsewhere heretofore. Any assistance you may give him by way of buying would be thankfully acknowledged, he being an acquaintance of mine.” This letter was probably all true, and yet it was well calculated to effect its object—to give Baker credit when it must be conceded he was unworthy of credit. It speaks of him as a merchant who for some *394 time had been in business ; it shows him as a man of some consequence in his way, as having packed 327 barrels of beef—a man of whom Addington had spoken when at Utica ; and, in effect, solicits or invites Wilson’s assistance by way of buying. This letter was admirably adapted to inspire confidence, and yet to avoid responsibility. It was calculated to secure the co-operation of Wilson, to impose upon and betray his confidence, and was using him for the basest purposes ; and, in my estimation, was more reprehensible, in a moral point of view, than a direct recommendation of Baker. Now what would have been Wilson’s conclusion on receiving this letter ? What would have been the conclusion of any man of business, who had received such a letter from a man for whom he was doing business, and in whom he placed confidence ? I hesitate not to say that it would, with most men, and men too of sagacity *and discernment, have inspired confidence, and would have been about as effectual in giving credit as an express recommendation.
Could any man, whose standard of morals was not entirely debased, solicit the assistance of another, “ by way of buying,” for a man known to the writer as utterly insolvent, and about to stop payment—a man whom he had advised to get all the goods he could on credit, that the writer might avail himself of them for the satisfaction of his own debt, and who stood ready to pounce upon them with his three executions ? I answer no. An honest man could not have written such a letter, without disclosing the facts that Baker was insolvent and largely indebted; and yet it was contended, on the argument, that this letter was “ a fair business transaction.” I do not think so ; and the jury, in my opinion, could have come to no other conclusion than against the purity of the writer’s intentions. Had Wilson given credit to Baker after receiving this letter, can any one doubt that Addington would have been responsible ? I should imagine not. And how can it be otherwise with Allen, if he was induced to give credit from what Wilson said on the subject ? I think there is no difference in principle. Wilson informed Havens, Allen’s clerk, (which I hold was the same as if he had informed Allen personally) that he had received a letter from Addington, and from information derived from him relative to Baker, and with his knowledge of Addington, he would sell to Baker, if he were selling goods. Now Wilson was doing precisely what Addington desired and intended ; he was assisting him in the way of buying; he was giving him credit which he never would have done had he known of the existence of the judgments and Baker’s insolvency.
But it was contended, on the argument, that the evidence was not sufficient to warrant the assumption that Allen gave credit to Baker in consequence of this letter. The first answer is, that the question was fairly submitted to the jury, whose province it was to pass upon it, and who have found the fact that this letter did induce credit. It is not proved that Allen or his clerk saw it before the sale, nor is it necessary that they should have seen it. Wilson informed Havens that he *had received the letter, and that it had inspired confidence that Baker was worthy of credit; and Havens swears expressly that he “ took a recommendation from Wilson, who stated that he had received a letter from Addington, and on that recommendation, he sold the goods,” Allen being out and in while Baker was by buying the goods. Again, Havens swears that “ the reason Allen did not follow the goods was in consequence of the favorable impression from Wilson.” The question, therefore, whether the letter induced the credit, should be considered at rest, as the jury have found the fact; and I am not dissatisfied with their finding.
What I have said will in a great measure supersede the necessity of remarking at large on the motion for a nonsuit at the trial. The motion was made *396 on several grounds : first, that the letter of Addington contained no false recommendations of Baker as a man worthy of credit, and was not written for the purpose of defrauding the plaintiff, who was not known to Addington. It is not contended that the recommendation was false, but that it fraudulently suppressed important facts ; and it was a fair question for the jury, whether the letter was not intended to defraud some one ; and if it was for a general fraudulent intent, the writer was equally responsible as for a particular intent. The two other grounds on which a nonsuit was asked to be granted I have already discussed, and have come to the conclusion that it was of no consequence whether the letter was seen by Allen, so long as he was influenced by it, through Wilson, to give credit; and information from Wilson to Havens the clerk, was in effect, information to the plaintiff,, and supported the allegation in the declaration that the information was communicated to Allen.
This action, if sustainable at all, was most clearly one in which smart money ought to be allowed. It was wholly a question for the jury, and their verdict should not be disturbed unless the damages were grossly excessive.
The next and only remaining question in the present state of the cause is, the important point whether the declaration is such as to uphold the judgment. I have not deemed it necessary to cite authorities ; they are well collected and arranged in the opinion of the supreme court. The *general rule in relation to declarations is this : where the declaration discloses no right of action, the judgment will be reversed; where there are several counts, some good and some bad, a nolle prosequi may be entered on the counts that are vicious, and judgment may be entered on the others; but if a general judgment is entered where there is a bad count, the judgment will be reversed. I am free to _admit that the declaration in the present cause is unskilfully drawn. It would probably have been held bad on special demurrer, and possibly it might have been so held on a good general demurrer to the second count, but my impression is that a general demurrer would not have overturned it—my remarks shall be confined to that count, for it is considered most defective by the counsel for the plaintiff in error.
The question is, whether that count will sustain the judgment; whether it is rendered good by the verdict, if defective before ; and not whether it would have been good on general demurrer. A verdict will not cure a defective right, but it will cure a right defectively or imperfectly set out; or, in other words, if the declaration contains the substance of a right of action, although imperfectly set forth, yet, after verdict, it is cured and is good to uphold the judgment, because the court will presume that all defects were supplied by proof, before the jury would have found or the judge have sanctioned the verdict. Let us for a moment look at this second count. The substance, as I understand it, is this: that Addington, by a letter to Wilson, encouraged him to assist Baker to procure goods on credit in New-York, he, Addington, knowing that Baker was unworthy of trust and credit, and largely indebted to himself; that Wilson did in that behalf assist Baker to procure goods upon the credit of the plaintiff; and that the plaintiff, confiding in and giving credit to the letter and representations made by Wilson at the instance of Addington, and believing the same true, did sell divers goods of the value of $2000, on such trust and credit, to Baker; whereas, in truth, at the time the defendant wrote the letter, Baker was not a person safely to be trusted, and was largely indebted to the defendant, all of which was known to him; and the plaintiff avers that the defendant falsely and fraudulently deceived and caused *the plaintiff to be deceived in this: that at the time of writing the letter, and at the time of the sale and delivery of the goods, Baker was unworthy of credit, *397 and not safely to be trusted, but was largely indebted to the defendant, all of which he knew; by reason of which fraudulent assertions, representations and letter, the plaintiff has been deceived and imposed upon, and has wholly lost his goods. Now, it appears to me, that however unskilfully this declaration has been drawn, this count contains in _ substance a good right of action, and after verdict should sustain the judgment. It alleges that the defendant encouraged Wilson to aid Baker in obtaining credit, knowing that Baker was largely indebted and unworthy of credit; that Wilson did assist him to obtain goods of the plaintiff, who, from the representations, believed Baker worthy of credit, when the defendant knew Baker to be indebted and unworthy of credit, whereby the plaintiff was deceived and defrauded of his goods. Here, most clearly, is an allegation of fraud on the part of Addington, and damage on the part of Allen, growing out of that fraud; and these two allegations are always the substantive charges in this class of actions. The circumstances are partly set out and the residue supplied by proof, as we are to hold after verdict. The declaration then, in my judgment, is sufficient after verdict; and the proof abundantly sustained the allegations in the declaration, and justified the verdict.
I should indeed regret, if in this court of dernier resort, constituted for the protection of the rights and property of the citizen and to sustain the great principles of justice between man and man, the substance in controversy between parties should be sacrificed to form. Technical rules, I admit, must be preserved; but they more properly belong to subordinate tribunals than to this court of last resort. Parties, before they arrive in this court, have opportunities, in almost every stage of the proceedings, to raise and avail themselves of technical objections. Here they should not be encouraged or suffered to prevail, if we have a substance sufficient to sustain the superstructure. The jury, who have passed upon the facts, have pronounced Addington guilty of a base fraud; and the supreme court have approved of the verdict, and have said that *the law supports the action, and that the declaration is sufficient to sustain the judgment, and that too upon technical rules. I cannot consent to suffer the defendant to escape from what I consider a most righteous retribution, by means of legal subtleties that might or might not have been available at an earlier day and in another tribunal, had they been raised for decision by demurrer. That time has gone by, and after “ he has been weighed in the balance and found wanting,” by a jury of his country, he shall not, with my consent, go “unwhipped of justice” in this court, upon strained technical objections. I am therefore for affirming the judgment of the supreme court.
■ By Senator Edmonds. Upon the question of granting a new trial in this case, there does not appear to me to be much difficulty.
The circuit judge very properly refused the nonsuit. Whether the letter of Addington contained any false recommendation of Baker, as a man worthy of credit, and was written for the purpose of defrauding Allen, was a question very rightfully submitted to the jury. And whether that letter was ever seen by Allen, or any one acting for him, was entirely immaterial, if it was the means of inducing Allen to give credit, and its contents or purport had been communicated to him or his agent; and it seems to me to be equally immaterial whether the facts on which the credit was given were communicated to Allen or his clerk ; Allen was the person injured ; the communication to his clerk was a communication to him, and he was the only person to prosecute, The grounds on which the motion for a nonsuit was founded were untenable, and there is no error in this part of the case.
In the charge to the jury, the judge stated the true ground on which the action is to be sustained, if at all, to wit, that Addington had not disclosed the *399 whole truth, and that withholding the truth would render him liable, equally with communicating a falsehood. I think he was right also in charging that Addington was liable for the acts of Wilson, within the scope of the agency created by that letter, and that the defendant’s liability did not depend upon the fact whether this *letter was the only recommendation of Allen but whether Allen or his clerk was moved by it to give credit to Baker.
In fine, without occupying space with a recapitulation and examination of all the questions raised by the counsel on the argument, and expressing once for all my acquiescence in the decision below, except so far as the same may be affected by any subsequent remarks, I conceive that the following questions are those alone upon which this case is to be determined by this court; and I shall therefore inquire, 1. Whether the evidence discloses any fraudulent conduct on the part of Addington, whereby Allen has been deceived and injured; 2. If so, whether that fraud assumes such a shape as to be the ground for an action; 3. Whether the cause of action has been properly spread out upon the record ; and 4. If it has not, whether the defect or omission is cured by the verdict.
First, as to the fraud. Baker was insolvent when Addington gave him the letter to Wilson. Addington knew it, and was then a judgment creditor of Baker’s to a large amount, with power “ to sell him out,” and close his business at any moment. The letter is guarded and cautious. It conveys, but only by inference, that Baker was largely engaged in the business of packing beef. It said that Baker had been a merchant some years at Aurora, Erie county, leaving the impression that Baker was still largely engaged in business; and while it asked Wilson to give Baker assistance, by way of buying, it carefully concealed the fact that Baker was a relative, intimately connected with him in his business transactions; that Baker was insolvent, and the writer of the letter his greatest creditor, with full power to sweep away all that he had. If Baker had gone to New-Yorkto buy goods for cash, this concealment would have been of no consequence. The assistance in buying, which Wilson could have then rendered him, would have been very different from that which he did render, and which it seems he expected he was to render. I will not stop to inquire whether Wilson was not engaged in a business of so entirely different a character, as to disqualify him from rendering any aid in buying for cash the goods that Baker wanted, nor to inquire what assistance in buying dry goods for cash, Baker, who had for some years *been engaged in the business, could expect to receive from a man engaged in packing beef. If we did make these inquiries, we should be satisfied, I think, that Addington did intend to aid his nephew in procuring credit, by concealing most important facts. But if any doubts were left upon our minds, the other testimony in the case must satisfy us, not only that Addington knew that Baker intended to buy goods on credit, and not for cash, but that Addington designed to aid him from fraudulent motives.
I refer now to the testimony of Mr. and Mrs. Steel and Pamela Hall. It was attempted on the argument to shake our confidence in the credibility of those witnesses ; but I apprehend that that is a question not open for discussion in this court; it was a question of credibility which is peculiarly within the province of a jury. Their finding is conclusive upon us, and we are not now at liberty to inquire whether this testimony is false or not. So far as our duty is concerned, it must be taken as true, and it shows that after Baker had gone to New-York, and probably while he was there, Addington knew that Baker could not pay what he then owed, much less any new debts he might contract; that he must fail; that his affairs were so deranged he could not get along; that he then owed Addington a considerable sum ; that Addington had *401 advised him to go to New-York and get what goods he could; that then, and doubtless out of those goods, Addington would be able to get his pay, and Baker might have enough left to compromise with his creditors. Here then is a full disclosure of Addington’s motive, in endeavoring to assist Baker in buying goods, not for cash, but on credit; that without exhausting Baker’s present means, his future ability to pay Addington’s debt might be increased, at the expense of those with whom he might deal, and, as it appears to me, at a great expense of honesty and good faith. The subsequent conduct of these parties still farther explains their intention. Baker purchased goods in New-York to the amount of about $4000, and on his way home conveniently met Adding-ton at Albany, and there his uncle, who was apprehensive for the safety of his debt, advanced him $1130 more, and took from him no other security than the simple obligation of a man who he knew must fail. After Baker had sgot his goods home, some of his creditors brought suits against him. This “ stopped his business of course,” he says. Addington was immediately apprised of these suits, and in about two months after the goods had arrived at their destination, all that Baker had was sold on Addington’s executions. One circumstance, characterizing the transaction ought not to be forgotten : When Baker sold the beef and lard to Addington, which amounted to about $2000, the judgments of the latter for about $2500 had been obtained and were then in full force, and yet the executions were afterwards issued on those judgments for their full amount, crediting nothing to Baker, for the large payment he had thus made. Baker also deeded his store and lot, worth about $300, to Addington, yet I do not discover any allowance to Baker therefor on the executions. The greater part of the goods was bought by Addington, and Baker was left in the possession of them, until shortly before the trial at nisi prius, and Addington compromised with the creditors, and paid them all they received on such compromise. These are the circumstances attending this transaction, and they indicate to me, as they did to the jury, a deliberate purpose of defrauding some person by a suppression of the truth. The fraud was successful, so far as the plaintiff was concerned. The jury have found that he was induced by the conduct of Addington to part with his property, and we cannot now question it. This is then, in my view, a clear case of fraud and damage, with the addition of benefit to the person complained of.
It was urged very strongly, on the argument, that there was no evidence that Addington had been acting, in obtaining credit of Allen, for Baker, or, in other words, that Allen’s clerk sold the goods to Baker, before he applied to Wilson. This is not, I apprehend, a question which this court ought now to entertain. It is a question of fact, that peculiarly belonged to the jury to decide. There was conflicting evidence upon this point, and it was the jury’s particular province to reconcile it. So far as the motion for a new trial depends upon this point, I think we ought to adopt the well settled rule of the supreme court, and permit the finding of the jury to control, unless it is palpable and undoubted that their verdict is *against evidence. Any other course would not only be an encroachment upon the province of the jury, but would convert this court into a tribunal of appeals upon questions of fact. One of the greatest advantages of the trial by jury, is the opportunity afforded to jurors of seeing the witness when he testifies, and of judging from his manner, his looks, his actions, and indeed his whole appearance and conduct, whether he is relating the truth. Many of these considerations, which do, and ought to influence jurors, can never be spread upon the record, and he who is to judge from the record, can never judge as accurately as the person who witnessed the manner in which the evidence was given; and if this court *403 is to sit in judgment on questions of fact, which have been passed upon by a jury, we are to do so without possessing the advantages of a jury, and must consequently be far more liable to err. I should, under such circumstances, very much distrust my own judgment; and although I might think, that upon the evidence as disclosed upon the record, I should arrive at a different conclusion from that of the jury, yet I should feel myself bound rather to sustain than overthrow their decision, because it might have been made upon matters which could not come to my knowledge. If a different rule is to prevail, the character of the court will be very materially changed, and the advantages of the trial by jury must give place to great uncertainty and much unprofitable litigation. I therefore believe that it is at once safer and more conformable to our duty, to consider this point as settled by the finding of the jury.
Second, as to the remedy. It remains for us next to inquire whether the law has furnished any redress against the fraud disclosed in the case, and whether the facts as found by the jury will lay the foundation of a suit at law. One great object of the law, which we are called upon to administer, is the detection and punishment of frauds, and the protection of the innocent and unsuspecting from the depredations of the artful and designing. This forms our most interesting duty—this commends oiir legal system to the favor of an enlightened community ; and if the system is so far defective *that a case of palpable fraud, solemnly adjudged to be so by the proper tribunal, can avoid the proper measure of redress, it is high time that the rightful remedy be applied.
It has long been a well settled principle, that the suppression of the truth is equal to the expression of a falsehood in constituting fraud ; and it is equally well settled, that he who falsely, and with a view to the advancement of his own interest recommends another to be worthy of credit, when he knows him to be otherwise, is guilty of fraud for which a remedy exists in our courts. These two principles, in the absence of all authority, would he sufficient for the purposes of this case. Upon the latter principle we have authority. Pasley v. Freeman, 3 T. R. 51, was the first case. This was in 1789, and was followed by numerous cases and a series of decisions down to that now under consideration.. Eyre v. Dunsford, 1 East, 318. Haycraft v. Creasy, 2 id. 92. Hutchinson v. Bell, 1 Taunton, 557. Vernon v. Keyes, 12 East, 632, Day’s ed. p. 634, and note at the end of the case. Ashlin v. White, 1 Holt’s N. P. 387. 3 Com. Law R. 136. Tapp v. Lee, 3 Bos. & Pul, 367. 1 Selw. N. P. ed. of 1823, p. 489. Scott v. Lara, Peake’s N. P. 226. Harner v. Alexander, 5 Bos. & Pul. 241. Clifford v. Brooke, 13 Vesey, 131. Ex parte Case, 3 Vesey & Bea. 110. 2 Starkie’s Evidence, 470. The courts in our country have recognized the principle and sustained the action, so that, as Chancellor Kent justly observes, 2 Comm. 489 the doctrine of Palsey v. Freeman is now well settled, both in the English and American jurisprudence. Wise v. Wilcox, 1 Day’s R. 22. Russell v. Clark, 7 Cranch, 92. Patten v. Gurney, 17 Mass. R. 182. Upton v. Vail, 6 Johns. R. 181. Young v. Covel, 8 id. 25. Gallagher v. Brunel, 6 Cowen, 346. The foregoing cases all proceed upon the ground of false representations, or expressio falsi. The cases of Hart v. Tallmadge, 2 Day’s R. 381, Eyre v. Dunsford, in 1 East, and Bruce v. Ruler, 2 Man. & Ryl. 3, 17 Com. Law R. 290, proceed on the same doctrine, and apply the principle to cases of suppressio veri, where the party acted in obtaining credit for another, but concealed some fact material to the goodness of that credit. These cases establish this doctrine: that where a person, with a design to deceive and defraud, makes a favorable Representation of the credit of a third person, knowing it to be false, or makes *404 some representation which enables that third person to obtain credit, and con ceals facts within his knowledge which show him unworthy of credit, in conse quence of which concealment or false representation some person is deceived and defrauded of his property, or is induced to enter into a contract whereby he sustains injury, in consequence of the insolvency of the person in respect to whom the representation is made, an action on the case will lie against the person making the representation, although a stranger to the contract, and not deriving any advantage from the deceit. But there must be an intention to deceive, whether from expectation of advantage, as in the case under consideration, or from ill will to the person deceived ; and fraud and falsehood on the one side, and damage in consequence thereof on the other, must concur to sustain the action.
It was urged, on the argument, that the cases to which we were referred, from Pasley v. Freeman down to the present time, had all occurred since the adoption of our constitution, and were not therefore binding upon us, and that this court was now called upon for the first time to sanction this doctrine. Be it so; yet I am prepared to adopt it as a part of our jurisprudence. There is no characteristic of the common law more valuable than that which enables it to accommodate itself to the growing wants of the community, and above all to afford adequate remedies for the new forms which fraud is made to assume by the cupidity and ingenuity of man ; and while all our religious, moral and social duties teach us that if any one becomes an actor in deceiving another, if he designedly lead him by misrepresentations to do acts which are injurious, he ought to compensate for the injury he has thus inflicted—the principles of the common law require from courts of justice the legal remedy to enforce this obligation. I can see, then, in this doctrine, nothing to deprecate, but much to approve and sustain.
Third. Is the declaration defective in setting out the cause of action? The first count' is on a fraudulent representation, and it is not contended that the evidence supports that count. As to the second and third counts, we are not to examine them *with the same critical eye with which we would view them if brought before us on demurrer. The question is, shall we establish a wrong and dangerous cause of action by sustaining that which is fairly presented by the pleadings, and can we properly understand the matter complained of in the declaration, as stating that the defendant by his letter to Wilson induced the plaintiff to give credit to Baker, and fraudulently deceived him ? If so, how did he deceive ? By falsely representing Baker to be worthy of credit ? No; but by concealing the fact that he was unworthy of credit. The letter contained no affirmation of Baker’s worthiness of credit, and he could not have deceived him in any other manner, under the circumstances, than by concealing his unworthiness of credit; so that if the declaration had contained the averment that the defendant concealed from the plaintiff the fact that Baker was unworthy of credit, it would confessedly have been perfect. Upon demurrer, the omission of this averment would doubtless have been fatal; and whether it would be fatal on a motion in arrest of judgment, is now the question before us.
Fourth. If, then, the omission of this averment is a defect in the pleading, is it cured by the verdict ? The rule is this : that where there is any defect, imperfection, or omission in any pleading, whether in substance or form, which would have been a fatal objection upon demurrer, yet if the issue joined be such as necessarily required on the trial proof of the fact, so defectively or imperfectly stated or omitted, and without which it is not to be presumed that either the judge would direct the jury to give, or the jury would have given the verdict, such defect, imperfection or omission is cured by the verdict; but if
*406 the plaintiff either states a defective title, or totally omits to state any title or cause of action, a verdict will not cure such defect. After verdict, every thing shall be intended which the allegations of the record require to be proved. 1 Saund. 228. Crouther v. Oldfield, 1 Salk. N. C. Hitchins v. Stevens, Sir T. Raym. R. 487. Nerot v. Wallace, 3 T. R. 25. Mackmurdo v. Smith, 7 id. 518. 2 Ld. Raym. 1061. Seymore v. Gartside, 2 Dow. & Ry. 55. 16 Com. Law R. 72. Leffingwell v. White, 1 Johns. Cas. 99. Pangburn v. Ramsey, 11 Johns. R. 141. Chapman v. Smith, 13 id. 78. Bank *of Utica v. Smedes, in the court of errors, 3 Cowen, 685. 2 R. S. 425, § 7. pl. 8, 9. Testing the case before us by this rule, it seems to me that the defect or omission in this declaration is cured by the verdict. The pleading says that Addington was acting in obtaining credit of Allen for Baker, that he knew Baker to be unworthy of credit, and ‘that he deceived Allen, whereby Allen sustained damage. This, then, is the cause of action, and it is a perfect one. The fraud and damage constitute the cause of action ; they are both averred. The manner in which the fraud was perpetrated is alone omitted. The jury have found that Addington did deceive, and that Allen did thereby sustain injury; they have thus established the point on which the cause of action, or in other words, the plaintiff’s title rested. Now it seems to me inevitable, that the judge would not have directed the jury to give, nor would the jury have given such a verdict, unless it had been proved on the trial that Addington concealed the fact that Baker was unworthy of credit, or suppressed the truth in this respect, or, in the language of one of the cases, we are now required to intend that the fact of this concealment was proved on the trial; for the allegation of the record that Addington had deceived and defrauded Allen in this behalf, required that that should be proved. I am consequently of opinion that the verdict cures the defect in the declaration.
Nor can I see any hardship to the defendant, arising from the application of this rule. If the declaration had been so far defective, as not sufficiently to apprise the defendant of the precise character of the charge which he was called upon to answer, his remedy was by demurrer; and if he had resorted to it, he would have found in the rules and practice of the court a sufficient protection against this inconvenience ; or if the evidence should establish a different cause of action from that which by the pleadings he was called upon to defend against, an adequate remedy was provided in the motion for a nonsuit. But if he permitted both these opportunities to pass, without attempting to take advantage of an error so palpable as it is averred this is, but went on, notwithstanding, and tried the experiment of a trial on the merits, I cannot feel the force of the appeal which he may now make to us to save *him from the consequences of his own misjudgment. He has chosen his own tribunal for the decision of his case; he did not ask the supreme court to decide it upon demurrer; he did not seek a decision by the circuit, judge upon a motion to nonsuit; he demanded a trial on the merits by a jury; he lulled his adversary into security as to the defects now complained of, and subjected him to all the expense of a trial; and now, when the decision on the merits is against him by a tribunal of his own selection, I know of no principle of justice or equity which compels us to listen to his complaints. He comes before us convicted of a gross fraud ; and after having led his adversary through various courts at great expense, he now asks us to reverse the decision which has been made against him, not on the ground that the evidence does not warrant it, but because of a formal defect, a technical omission, which every principle of fairness and equity required him to set up at the very first opportunity, and in a much earlier stage pf the cause. I am not willing to acknowledge the pro *408 priety of his demand. I am not willing that this court shall be converted into an arena, in which matters of form may overrule and bear down the obvious merits of a case, and resort had to it for the purpose of protracting litigation, and of hindering rather than advancing justice ; and it seems to me that we shall much better attain the object for which this court was created, by regarding the great principles of justice and equity involved in the cases which may come before us, than by permitting those principles to be sacrificed to an adherence to those forms which were adopted for the purpose of ministering to, not controlling the administration of justice. I conceive this view to be in exact conformity to the principles of the cases I have cited. They intend to establish a point, beyond which objections of form shall not be made. The decision of the jury is that point in cases like the present. Such is the doctrine of all the cases, and such the spirit of our statutes. A decision on the merits being the great end and aim of trials in our courts, such decisions ought to be supported, unless controlled by some great and leading principle of law; but that control ought to be clear and unequivocal. So long as there is room for doubt, the inclination of our minds * ought to be to that course which shall soonest terminate the dispute between the parties upon the merits of the case. Testing this case by these principles, the verdict of the jury can and ought to be supported.
I am therefore of opinion that the judgment of the supreme court ought to be affirmed.
By Senator Tract. This is an interesting case in both aspects in which it is presented for the consideration of this court; and there is, I confess, greater intricacy and uncertainty in some of the questions it involves, than I had anticipated.
As a decision, either on the bill of exceptions or on the motion in arrest of judgment, demands, more or less, an examination of the principle how far a false representation of a person’s trustworthiness subjects' the party making it to an action, I shall first briefly examine it.
The frequent and elaborate discussions had upon this principle in courts of great learning, and the diverse opinions held by eminent lawyers in regard to it, would make it seem presumptuous for me to say that it involves no real difficulty. But after a patient attention to the argument of this case, and carefully consulting the authorities cited, I am constrained to say that I have not discovered reasons for regarding the doctrine of the leading case of Pasley v. Freeman as new in principle, or any way justifying the grave doubts which for a long time prevailed in regard to it. If I have not mistaken the principle on which that decision rests, it is one coeval with the moral law, and must have been sanctioned in some form ever since the institution of courts of justice. It is a plain deduction from that universal proposition which is recognized at the first organization of society, that he who does an injury to another, either from motives of profit to himself, or of mere malice, shall be held liable to respond the damage he inflicts. It is the very foundation principle of all social security, and a well deserved reproach would it be to the judicial institutions of a country, that they were incapable of giving it effect. I agree with Sir James Mansfield, that there never was a time in the English law, when an action might not be maintained for so gross a wrong as that of designedly ^inducing a person by false representations to give credit to one not worthy of it, and in view of profiting by it himself. One of the oldest maxims tobe found in the books, is, that although “ fraud without damage, or damage without fraud, gives no cause of action, yet, where these two do concur, there an action lietb.” 3 Bulstrode, 95. And we are informed by *409 Chief Justice Willes, that a special action on the case was introduced for the reason that the law will never suffer an injury and a damage without a remedy.
But although the law is thus provident of remedies, it is not to be understood that the violation of every social or moral duty will afford the ground of an action ; for it is not every act which of itself is dishonest or immoral, that in the legal sense of the term is an injury. It even may happen, that a person shall be damnified by an act of another which was in itself wrongful, without having a remedy against him ; for an act may be wrongful, and not be legally fraudulent. Perhaps fraud, in its legal signification, is a wrongful act done with a wrongful intent, and therefore the proposition that fraud and damage concurring give an action, is not the same proposition as that wrong and damage will sustain an action. The technical word injuria means not simply a wrong act, but a wrong act with a wrong intent; and with diffidence I suggest that much of the opposition to Pasley v. Freeman has arisen from Lord lienyon having confounded this distinction, and attempted to push the doctrine so far as to sustain an action wherever wrong has produced damage, whether designed to produce it or not. His just notion that all laws stand on their best and broadest basis, which go to enforce moral and social duties, inclined him to the conclusion that a person guilty of the immorality of telling a lie should be responsible for all the damages which the lie occasioned, although he did not design or contemplate that any such consequences 'would follow. But this rule, however right in ethics, has not yet obtained at law. It did not have the sanction of the court in the case referred to ; for although that judgment was maintained, yet all the judges except Lord Kenyon agreed that an action could not be supported for telling a bare naked lie—that is, for saying what was false, whether knowingly or not, if said *without design to injure any person. If a doubt existed that the peculiar views of Lord Kenyon did not control this decision, it is dispelled by the subsequent case of Haycraft v. Creasy, 2 East, 92, in which case, although Lord Kenyfln was disposed to adhere to his former opinion, all the other judges, Grose, Le Blanc and Lawrence, agreed that it was not sufficient that the defendant’s represen- ■ tations were false, but they must also be proved to have been made malo animo.
Le Blanc, justice, says : “ The law, as laid down in Pasley v. Freeman, went no further than this ; that where a party with a design to injure another, makes a false representation, in consequence of which another is damified, he shall answer in damages.” This construction of the decision seems afterwards to have prevailed universally in the English courts, for we find Lord Ellenborough ruling in Dawes v. King, 1 Starkie’s R. 61, that to sustain the action, it must be shown that some deceit was used for the purpose of putting the party off his guard and preventing him from being watchful; and again, in Ames v. Millward, 2 Moore, 713, the whole court agreed that an intention to deceive was necessary to support the action, and quoted with approbation the remarks of J. Le Blanc, as restricting the decision in Pasley v. Freeman to its true principle. In this state, the cases of Upton v. Vail, 6 Johns. R. 181, Young v. Covel, 8 id. 25, and Gallagher v. Brunel, 6 Cowen, 350, recognize the doctrine in Pasley v. Freeman, or defined in Haycraft v. Creasy. It will appear from all these decisions, that although an action grounded on the fraudulent misrepresentations of persons not parties to the contract appears to have its origin in Pasley v. Freeman, yet in principle it harmonizes with the old action of conspiracy, and the action of deceit between the contracting parties ; that to sustain it, the same circumstances should concur as to support an action for deceit between contracting parties—that is, fraud in the defendant *411 and damage to the plaintiff. This fraud may consist as well in the suppression of what is true, as in the expression of what is false ; but in all cases the intention to deceive is essential.
The hostility which some distinguished judges, and particularly Lord Eldon, entertained against the doctrine of *Pasley v. Freeman, was founded principally in the opinion that it tended to the evasion of the statute of frauds, or at least to the support of a principle inconsistent with the scope and object of that salutary statute. This, without doubt, is an evil which may be justly apprehended from the encouragement and multiplication of suits of this nature ; but still it is not such an evil as courts have the right to avert, by overthrowing or refusing to give operation to general principles of law. The statute of frauds does not profess to change any existing rules of moral or legal obligation, except by defining the character of the proof, which shall be required under certain circumstances to establish that such obligation exists. The statute is not designed to limit the general proposition that fraud and damage concurring will sustain an action, but merely to define the proof that in certain cases shall be necessary; and except in the cases specified, the statute can have no effect. The action for fraudulent misrepresentations, if within the policy, is not within the terms of the statute, and therefore is left to be supported by that species of proof which, without the statute, has always been held sufficient to establish any extent of moral delinquency whatever. If experience shall prove that the frequency of these actions, and the looseness of the proof by which they are sustained are working a public mischief, it will become the duty of the legislature to interpose, as the British Parliament has already found it necessary to do, and require that recommendations for credit shall be in writing to entitle them to be received in evidence. In the mean time, it will remain the duty of courts to give effect to known legal principles, without being deterred by the anticipation of possible mischiefs. The case being then founded rightly in principle, it remains to be examined whether the pleadings and proceedings in it are sufficiently regular to sustain the judgment. And first as to the pleadings.
It is contended for the plaintiff in error that the second and third counts of the declaration are so defective that the judgment must be arrested, according to the well acknowledged principle that judgment cannot be rendered on a general verdict, under a declaration containing bad counts. As it is equally fatal whether both the second and third counts, or *only one of them is bad, I have confined myself to considering the second count alone.
But before entering into its particular consideration, I will present briefly some general rules of pleading, which, though well known, cannot be kept too directly in view, whenever a question of this nature is to be examined. The declaration should contain a specification, in methodical and legal form, of the circumstances which constitute the plaintiff’s cause of action; all the facts necessary, in point of law to be stated with such precision, certainty and clearness, that the "defendant may know what he is called upon to answer. 1 Chitty’s Pl. 248, 255. 3 Wendell, 134. Facts are tobe stated, and not inferences, or arguments, or matters of law. Com. Dig. tit. Pleader, C. 78. And in all cases, those facts which are descriptive of the cause of action must be introduced upon record, in opposition to arguments or inferences. Cowp. 683. It is a maxim too, in pleading, that every fact shall be taken most strongly against the party pleading it, for it is to be intended that every person states his case as favorably to himself as possible. 1 Saund. 259. Co. Litt. 303, b. It is insisted, that if the second count be tested by these rules, it will be found *413 fatally defective, and especially that it does not contain facts which show a legal right of action in the plaintiff. The substance of this count is, that the defendant, by a certain letter, induced, persuaded and encouraged E. Wilson to assist G. W. Baker to procure goods on credit, the defendant knowing him to be unworthy of credit; and that the plaintiff, confiding in the letter and in Wilson’s representations, made at defendant’s instance, credited Baker, and suffered damage. The inquiry which most naturally first arises is, does the count contain a distinct allegation of fraud against the defendant 1 To be sure, in the letter part of the count, it alleges that the defendant falsely and fraudulently deceived the plaintiff, but it proceeds to show how—which was, that Baker, at the time the defendant wrote the letter, was not worthy of credit, and the defendant knew it. But as no part of the count shows what was in the letter, or asserts that it contained any thing inconsistent with the fact that Baker was unworthy of credit, this general allegation, whether it be regarded as a distinct averment, or as a ^general conclusion of the count, does not aid, unless we are permitted to infer that the letter did falsely affirm that Baker was worthy of credit. This cannot be done, for it would not only violate the preceding rule of pleading, that a person is to be presumed to state his case as favorably for himself as he can, but it would violate a still more important maxim, that fraud shall not bepresumed. It is an intendment of law that a party is guiltless of fraud, and therefore if fraud is made the ground of the action, it must be distinctly shown, for nulla inhonesta suntpraesumenda; Co. Litt. 78, b.; and if it is not distinctly alleged, it cannot be inferred to aid defective pleadings. 13 Johns. Rep. 402. The only quality or attribute ascribed to the letter is, that it was the means of inducing, persuading and encouraging Wilson to assist Baker to procure goods on credit. This the letter might have done, even if it had contained a true representation of Baker’s pecuniary circumstances. It might have given such assurances of his honesty, industry and capacity, as to induce Wilson to assist him; or it might have contained a pledge that the defendant would endorse for Baker, or in some way become security for him ; or a promise to Wilson, that if he would endorse or become security for Baker, the defendant would indemnify him. But if we assume that the defendant deceived Wilson as to Baker’s trustworthiness still the count does not show what assistance the defendant intended that Wilson should render Baker, or what assistance he did in fact render to him. It should show not only that Wilson’s representations were false and material, but also that they were authorized by the letter. It neither states these facts, nor can they, or either of them, be legally deduced from facts that are stated. Without knowing what the defendant wrote to Wilson, we do not know what Wilson was authorized to say to the plaintiff; and knowing what was written, without knowing what Wilson said, would not aid so far as to justify the conclusion that the plaintiff’s credit to Baker was in consequence of the defendant’s letter. In Butler v. Kent, 19 Johns. Rep. 228, the rule is laid down by Ch. J. Spencer, that in cases of tort it is necessary to show that the particular damage in respect to which the plaintiff proceeds, was the legal and natural *consequence of the wrongful act imputed to the defendant. Connected with this consideration is the objection that as the action is founded on fraudulent representations, operating on the plaintiff’s mind, it is necessary that these representations should be so far stated in the declaration as to show to the court that they were equal to produce the effect complained of. The rule is universal that the gravamen of the action must be precisely set forth ; and in every case cited in support of this action, it will be found that the declaration states the representations that were made, and avers that they were false and fraudulent, and known to be so. Here the plaintiff *414 substitutes for the representations the conclusion of his own mind, without showing facts sufficient to warrant it. In an action of fraud, between contracting parties, suppose, in the sale of a horse, would it be tolerated for the plaintiff to declare that the defendant fraudulently induced him to give one hundred dollars for a horse which he knew was not worth twenty 1 Clearly not; for the mere deduction of the party’s own mind is not traversable. 20 Johns. Rep. 427. Something must be stated to show to the court that the cause is equal to the effect; but we look in vain for it in this count. The precedents in Chitty and Wentworth, as well as several cases cited for the defendant in error, are not analagous, inasmuch as they all are where the damage resulted from the act of a third person which the defendant is charged with having induced. Here the damage complained of results from the plaintiff’s own act, and the wrong complained of is, that the defendant, by the intervention of another person, induced the plaintiff to do it.
I have not succeeded in finding a case that exactly illustrates this particular view, for the reason, I think, that a declaration framed on the principle of the one in this case was never before presented for the grave consideration of a court. But the case, 2 Shower, 435, which was cited and approved, 3 Maulé & Selw. 114, is somewhat analagous. It was in slander, where a count alleging that the defendant “ uttered certain words which imputed insolvency to the plaintiff,” was held bad after verdict, for the reason that the words uttered should be set out. In Evertson v. Miles, 6 Johns. R. 138, it was *held, that in a declaration for fraud in the sale of a horse, the general words “ contriving and fraudulently intending to injure,” &c. together with an averment that the defendant “ craftily and subtil!y deceived,” &c. would not supply the want of an averment that he “ falsely and fraudulently represented the horse to be gentle, knowing him to be vicious.”
But if this count stated, what clearly it does not, that the plaintiff gave the credit to Baker in consequence of representations made by the defendant, and that those representations were untrue, and known to be untrue when they were made, yet there is still wanting an indispensable averment, which is, that the defendant made the representations with an intention to deceive and defraud the plaintiff. It has been seen in the cases already cited, and especially in Ames v. Milward, 2 Moore, 713, that the mere assertion of a falsehood by one party, although producing damage to another, will not sustain the action unless the intention to defraud is also proved. This intention, therefore, should be distinctly alleged in the declaration for it constitutes the very gist of the action. In Bayard v. Malcolm, 2 Johns. R. 550, Mr. Senator Clinton forcibly remarks.
“ To say that the plaintiff need not state the very fact which constitutes his right of action, is not only repugnant to the dictates of common sense, but is counter to the whole current of authorities. The books all agree that something must be expressly and substantively charged, against the defendant, that is fraudulent.”
It is urged, however, that noth withstanding this count might have been bad on demurrer, yet that it is aided by the verdict, and a distinction is attempted between the effect of a general demurrer and a verdict. Such a distinction doubtless exists to some extent, but I think not to the extent contended for, and at any rate does not apply to the present case. Conceding that the established rules of law authorize, and justice and public convenience require, that the principle of a verdict curing defects in pleading should be liberally applied, yet there are limits to this rule beyond which courts are not justified in going. The very idea of pleading at all, supposes the necessity of a party’s stating those facts which *416 are indispensable to show his rights ; and a rule like that urged on the argument, *that after verdict all facts are to be presumed which are necessary to justify the recovery, so far from disentangling justice from a net of forms, would inevitably embarrass it with uncertainties, and finally overwhelm it in confusion. It is one of the oldest and most inflexible rules of pleading, that if a declaration does not contain a cause of action, it shall not be aided after verdict. 1 Salkeld, 364. Many cases, several of which have been cited, show that where fact's, entirely omitted, and so connected with facts alleged that the facts alleged cannot be proved without proving those omitted, after a verdict, the facts omitted are presumed to have been proved on the trial; but the total omission of a material fact, which, as in the present case, is not connected with any fact alleged, is not aided by the verdict; and this, because the plaintiff need not prove, (indeed should not be permitted to prove,) on the trial, more than what is expressly stated in the declaration, or necessarily implied from facts which are stated. 1 Saund. 228, b. In Buxenden v. Sharp, 2 Salk. 662, the plaintiff declared that the defendant kept a bull that used to run at men, but did not say sciens, &c.; it was held bad after verdict, for the plaintiff need not prove more than is in his declaration. Lord Mansfield, little disposed as he was to embarrass justice with technicalities, repudiates the idea that after a verdict all is to be presumed proved that was necessary to justify the verdict. Douglas, 679. He refers to the rule laid down by Chief Baron Gilbert, and which is approved by Chancellor Kent, 17 John. Rep. 458, that “ If anything essential to the plaintiff’s action be not set forth, though the verdict be found for him, he cannot have judgment, because, if the essential part of the declaration be not put in issue, the verdict can have no relation to it; and if it had been put in issue, it might have been found false.”
The bill of exceptions, also, presents objections as fatal to the plaintiff’s right to maintain this judgment as those found in his declaration. I proceed to examine them, because I shall be better satisfied to have the cause tried over again, after the pleadings are amended, than simply to arrest the judgment. It is apparent that the testimony of the Steels had a controlling influence in producing the verdict; and yet, allowing to *it full credit, its bearing on the case is of questionable importance. The case seems to have been too much regarded in the nature of an action for conspiracy, where, the conspiracy on the part of the defendant being established, he becomes liable for all the acts of his coadjutors ; but this is not an action for conspiracy, but for false representations. The defendant is not charged with wrongfully influencing Baker, but with wrongfully influencing the plaintiff himself; and consequently he is not liable for Baker’s fraud, unless he connected himself with it some other way than merely by counselling him to commit it. Steel proves only that the defendant confessed that he had advised Baker to commit a fraud, but he does not prove that the defendant had done or intended to do anything to assist Baker to perpetrate it. The question is, what false representations did the defendant make of Baker’s credit ? for however great may be his moral culpability in the transaction, something more must be shown to sustain this action. It appears to me, therefore, that, for every purpose but that of showing the defendant’s intention, which does not become material till illegal acts are proved, as much other testimony is required to convict the defendant as though Steel’s testimony was not in the case. The only act of the defendant which was proved, is his letter to Wilson ; for his advice to Baker, however immoral, had no influence upon the plaintiff to induce him to credit Baker. Whether the letter should and did have this influence of persuading the plaintiff that Baker was worthy of credit is to be decided from the *418 letter itself, and not by extrinsic evidence of the defendant’s wish that Baker should obtain credit. He might desire that he should succeed in getting credit, and yet not be willing to do anything to make himself liable. Whether he has made himself liable is to be determined by what he did, and not by what he wished. The letter, so far as it relates to Baker, purports to be merely introductory ; it contains no affirmation that he is worthy of credit, or indeed that he intended or desired to obtain credit. The words, “ any assistance you may give him by way of buying would be thankfully acknowledged, he being an acquaintance of mine,” are all which import any interest in Baker’s business in New-York. These words, *even if they import a desire that Wilson should assist Baker to obtain credit, certainly contain no assurance that he is worthy of credit, nor is it easy to see how they would justify Wilson in mating such an assurance. There are many ways in which one person may assist another in buying, without recommending him to credit; and where a matter is susceptible of different constructions, the law will not assume that which imputes fraud. It, besides, is not a light objection to such a construction, that if the letter authorized a recommendation, it was a recommendation without limit as to time or amount.
Admitting that the jury might have been justified in construing the letter to contain or to authorize a recommendation, which is going far enough, yet this did not justify the judge to assume the fact, and on this assumption to allege another proposition which was wholly unfounded unless the first was clearly established. The charge virtually excluded from the jury the consideration whether the letter contained a recommendation, by asserting that it was the duty of the defendant to have communicated certain facts within his knowledge relative to Baker’s circumstances, and that his withholding them rendered him equally liable as though he had communicated a falsehood; that “ the suppression of such information would of itself be not only evidence of falsehood, but of a fraudulent intent by the defendant, to enable Baker to obtain the goods from the plaintiff.” If full force is given to the rule that suppressio veri is equivalent to expressio falsi, yet it cannot legitimately be extended so far as to make the suppression of one fact proof of the expression of another; but such is the reasoning, or at least the effect of the charge. Because the defendant did not communicate facts to show Baker unworthy of credit, it is assumed by the judge that he represents him as worthy of credit. But did he represent him to be worthy of credit ? This was a fact for the jury to decide, and that by what was in the letter, and not by what was out of it. If the letter contains no recommendation, then there was no duty on the defendant to communicate any thing of Baker’s embarrassments, and his not doing so affords no evidence of fraud. The principle of suppressio veri relates to the suppression *'of facts which would contradict or qualify those which are expressed. If one represent another as honest, he need not say he is in debt; or if he say he is rich, he is not bound to add, he is knavish. In this case, what is the thing expressed which the thing suppressed would contradict or qualify 1 Unless the letter recommended Baker’s pecuniary responsibility, there is no reason why the defendant should state that he held judgments against him. It is not easy to point to such a recommendation in the letter, and yet the assumption that it is there, is the ground on which the court charges, not only that the suppressions are proof of the defendant’s fraud, but that the defendant “ was equally liable for what Wilson said in consequence of not receiving that information, as he would have been, had he written to the plaintiff himself.” This disguises the preliminary and more important inquiry, which is, not what Wilson said because he did *420 not receive certain information, but what had he a right to say on the information which he did receive ? Does the letter authorize him to say that Baker was worthy of credit? When this is ascertained, then the inquiry of what was suppressed becomes material. If the letter contains no affirmation of Baker’s trust-worthiness, does it constitute Wilson the defendant’s agent to make such representations as he pleased ? If it does not, how is the defendant liable for what Wilson said in consequence of not receiving more information ? The reasoning of the charge may make the defendant’s liability greater than if the letter, instead of being addressed to Wilson, had been addressed to the plaintiff himself. If it had been, he would be bound by its legal construction ; but now he is to be benefit.ted by the unauthorized construction given to it by another.
The charge is also exceptionable in saying, that although the plaintiff might have been influenced to give credit to Baker by other circumstances, “ yet, if he was moved in giving the credit by the recommendation of the defendant, through Wilson, it was sufficient.” This is giving an alarming latitude to the doctrine of liability for false representations ! and, in its application, would inevitably overthrow a well established principle of law ; which is, that in actions of tort, it is necessary *that the damage should be the natural and direct consequence of the act of the defendant. 3 Wendell, 271. 8 East, 1. 2 Stark, Ev. 872. 19 Johns. R. 298. The principle of the charge in this respect is, that if the defendant “ was moved in giving the credit” in any, no matter how small a degree, by the defendant’s act, it is the same as if it wholly controlled him. Without attempting the metaphysical distinction between a direct cause and the causa causans of the schools, it may be made very plain that a fact may have an influence in producing a conclusion of the mind, notwithstanding the same conclusion would have been produced without the aid of that fact. It is possible that what Wilson said made some impression on the plaintiff’s mind, but it is probable that without this impression, Hickcox’s letter and other circumstances would have produced the same result. What, therefore, should have been submitted to the jury was, whether Wilson’s communication so far influenced the plaintiff as that without it he would not have given the credit to Baker. By excluding this consideration from the jury^ it allowed them to charge the defendant with damage which they may not have believed he occasioned.
I think the judge erred also in 'charging that the plaintiff “ had a right to pursue the property after the delivery and while it was in transition,” and therefore was equally entitled to recover, whether the defendant’s recommendation induced him to sell the goods or prevented his pursuing them. It was not a case where the right of stoppage in transitu existed ; but if it was, it would be confounding all the principles and purposes of pleading, to allow the plaintiff to recover under his present declaration. The term stoppage in transitu presupposes that the property is not delivered, or at least that it has not yet come to the hands of the other party. But in this case all the proof shows that the goods passed directly from the plaintiff to Baker, who was on the spot to receive them, and that there was no space of time when they were in transition. The supreme court agree that “ the right of stoppage in transitu had nothing to do with the case but they ^overlook the consequence that if it had not, then the judge’s charge was necessarily erroneous and calculated to mislead the jury. The proof leaves it at least doubtful whether the goods were not delivered to Baker before the plaintiff saw Wilson or ever heard of the defendant. If this was so, then the plaintiff’s case was not made out, for he did not give the credit in consequence of the defendant’s represen *422 tations ; and whether he did or not was the very question for the jury to decide-, but which is taken from them by the judge’s charging that it was the same thing, whether the defendant induced the original credit, or prevented the plaintiff from stopping the goods in transition.
Whatever anxiety courts may feel to restrain frauds, they must not, for the sake of punishing the guilty, break over those salutary rules of law and evidence which wisdom and experience have established, and which form the only safeguard for the innocent. It is possible that injustice has not been done to the defendant below, yet it is not certain but that it has been ; and it is cer tain that it may and probably will be done to others, if the present judgment is maintained, and the principles on which it is founded are allowed to become the established law of the land. After the length which I have felt it my duty to go in examining this case, I will not enter into general considerations that press on my mind, why this species of action should not be too much encouraged, and especially why courts, in their anxiety to punish one description of frauds, should be careful not to offer facilities for the perpetration of other frauds more mischievous, because more difficult to prevent. It is in the power, and, to use the language of Chief Justice Marshall, “ It is the duty of the individual who contracts with one man on the credit of another, not to trust to ambiguous phrases and strained constructions, but to require an explicit and plain declaration of the obligation he is about to assume.” But it is not in the power of any man to protect himself, if a blind and wilful confidence in representations, not calculated to impose upon ordinary prudence and sagacity, is to form the basis on which faithless memories *and interested testimony may establish a claim to an unlimited amount.
Í am for reversing the judgment and remitting the record that the pleadings may be amended and a new trial had.
On the question being put, Shall this judgment be reversed ? the members of the court voted as follow :
In the affirmative—The President, The Chancellor, and Senators Armstrong, Cart, Deitz, Edwards, Gere, Griffin, Lansing, Quackenboss, Tracy, and Westcott—12.
In the negative—Senators Beardsley, Conklin, Crofsey, Edmonds, Fisk, Gansevoort, Halsey, Macdonald, Sherman, and Van Schaicic—10.
Whereupon the judgment of the Supreme Court was reversed, with costs ; and the Court resolved that the third count in the declaration was sufficient after verdict to sustain a judgment, and directed the record to be remitted to the supreme court, with liberty to the plaintiff there to apply to amend the postea, either by the notes of the circuit judge, or by the evidence set forth in the bill of exceptions, so as to apply the verdict to the third count, and to render judgment thereon ; and in case that court shall refuse such leave, then that a new trial may be awarded by that court, on the application of the plaintiff below, and that he be at. liberty to apply to amend his declaration before the awarding of a venire de novo.